Hester MAGGARD, Individually and as Administratrix of the Estate of Edmond Curtis Maggard, Appellant,

v.

John J. O'CONNELL, et al., Appellees.

No. 81–1501.

United States Court of Appeals, District of Columbia Circuit.

Argued 25 Nov. 1981.

Decided 12 Feb. 1982.

---

David J. Frantz, Washington, D.C., for appellant.

William F. Hanrahan, Washington, D.C., with whom E. Calvin Golumbic and Jeanne K. Beck, Washington, D.C., were on the brief, for appellee.

Before WILKEY and GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

1. 29 U.S.C. § 186(c) (Supp. III 1979).

2. *Id.* § 1132(e)(1) (1976).

3. The Welfare and Retirement Fund was originally established as an irrevocable trust under

WILKEY, Circuit Judge:

Appellant Hester Maggard applied for retirement benefits allegedly due her late husband from the United Mine Workers of America Health and Retirement Funds. The application was denied by the appellees, trustees of the Funds. Appellant filed suit in federal district court pursuant to § 302(c) of the Labor-Management Relations Act of 1947[1] and § 502(e)(1) of the Employee Retirement Income Security Act of 1974,[2] alleging that the denial had been arbitrary and capricious. The district court granted summary judgment for appellees, and this appeal followed. We find the district court's review of the trustees' action inadequate, and so reverse and remand.

## I. BACKGROUND

Appellant's husband, born in 1908 in Jonancy, Kentucky, worked in the coal industry throughout his life. He began at an early age and retired in 1958, by which time he was totally disabled by pneumoconiosis, a mine-related disease, and arteriosclerotic heart disease. Maggard died in January 1980 as a result of bronchiopneumonia, with pneumoconiosis as a contributing cause of death.

Appellees are members of the Board of Trustees of the United Mine Workers of America 1950 Trust, the legal successor to the United Mine Workers of America Welfare and Retirement Fund of 1950.[3] On 17 March 1966 Maggard applied for retirement benefits from the latter. There followed a series of denials and reapplications of which this appeal is the latest installment. The procedural details of most of these applications and denials are of no moment here, though it is worth noting that the reasons given by the trustees for their disallowance were not always consistent.

Article XX of the National Bituminous Coal Agreement of 1950 with the authority of § 302(c) of the Labor Management Relations Act of 1947 (now codified as amended at 29 U.S.C. § 186(c) (Supp. III 1979)).

On 15 May 1980, four months after his death, the denial of benefits was sustained by appellees on the grounds that Maggard had established proof of only 12¼ years of classified service, including 4¼ years of signatory service after 28 May 1946.[4] Thus, even if credited with an additional 4 years of service for his occupational disability,[5] he would still fall short of the 20-year eligibility requirement. His widow then sued.

## II. ANALYSIS

The case before us is best analyzed by first exploring the applicable principles involved: specifically, the *award requirements* which must be met for the trustees to grant retirement benefits, and the appropriate *standard for judicial review* of the trustees' determination. Second, we shall apply these principles to the instant litigation.

### A. *Applicable Principles*

#### 1. *Award requirements*

According to the terms of the settlement in *Blankenship v. United Mine Workers of America Welfare and Retirement Fund of 1950*,[6] a miner who, prior to that decision, would have been ineligible for a pension[7] would nonetheless qualify if he met either of the two tests adopted by *Blankenship*. Under *Blankenship* Test One a miner like Maggard is eligible if he can show, inter alia, that he had completed at least 20 years of classified service at any time, including at least 5 years of signatory service after 28 May 1946.[8] Under *Blankenship* Test Two a miner who does not meet the requirements of Test One is still eligible for a pension if he completed 20 years of classified service prior to 1953, including any signatory service at all after 28 May 1946, and was physically unable to satisfy the "20-out-of-30" requirement because of a permanent mine-related disability.[9] It is *Blankenship* Test Two which appellant invokes in this action.[10]

Another principle with some bearing on the case at hand was involved, and broadened, in *Maggard v. Huge*.[11] It provides a maximum of 4 years' additional credit to miners who demonstrate by a preponderance of the evidence that they contracted an occupational disease which "was the direct and proximate cause of applicant's inability to work in the coal industry for a period of time of ascertainable duration."[12] As we will discuss later,[13] it may or may not be necessary for appellant to invoke *Maggard v. Huge*.

#### 2. *Standard for judicial review*

It is established that decisions of the trustees on pension eligibility are to be sustained by courts if they are not arbitrary or capricious, and if the trustees' factual judgments are supported by substantial evi-

---

**4.** "Classified service" refers generally to non-supervisory positions classified in the bituminous coal wage agreement then in effect; "signatory service" refers generally to employment by an employer who is signatory to such coal wage agreement.

**5.** See pp. 570–571 and 572 *infra*.

**6.** Nos. 2186–69 & 2350–69 (settlement approved by D.D.C. 2 Jan. 1973) (hereinafter "*Blankenship* settlement"), *reprinted in* Joint Appendix of Exhibits (J.A.E.), vol. I at 98.

**7.** Under Resolution No. 63 of the 1950 Fund, a pension was available only if 20 years of classified service in the coal industry were completed within the 30-year period immediately preceding the date on the pension application. J.A.E., vol. II at 370–76. The later Resolution 83 similarly required 20 years of service within the 30

years immediately preceding the receipt of the pension application. *Id.* at 377–93.

**8.** *Blankenship* settlement at 4, *reprinted in* J.A.E., vol. I at 101.

**9.** *Id.* at 4–5, *reprinted in* J.A.E., vol. I at 101–02. The "20-out-of-30" requirement is explained at note 7 *supra*.

**10.** Brief of Appellant at 17. Counsel for appellant confirmed this at oral argument.

**11.** No. 76–2219 (settlement approved by D.D.C. 14 Mar. 1979).

**12.** Policy Statement by the trustees, J.A.E., vol. I at 129.

**13.** P. 572 *infra*.

dence in the record as a whole.[14] Still, " 'the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia . . . ,' "[15] and judicial intervention is required "if the court becomes aware, especially from a combination of danger signals, that the [tribunal] has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making."[16] Similarly, "[m]ore exacting scrutiny will be particularly useful when for some reason the presumption of [tribunal] regularity . . . is rebutted,"[17] as, for example, "where the [tribunal] has demonstrated undue bias towards particular private interests, [or] . . . has had a history of 'ad hoc and inconsistent judgments' on a particular question . . . ."[18]

Because of the rather unique circumstances before us, we find that, although the appropriate standard for judicial review remains limited to determining whether the trustees' decision was based on substantial evidence and was neither arbitrary nor capricious, it is also incumbent upon the court to make this admittedly limited review with greater care than it might ordinarily. As we pointed out in *Natural Resources Defense Council, Inc. v. SEC*,[19] "the concept of 'arbitrary and capricious' review defies generalized application" and must be contextu-ally tailored. The same principle applies to the "substantial evidence" standard. A reviewing court may also be more or less likely to give the fact-finder the benefit of the doubt depending on the circumstances.

■ In the case before us today, we think it would be quite dangerous "to slip into a judicial inertia" given the "combination of danger signals" rebutting "the presumption of agency regularity." There have been a number of cases already holding the Funds' regulations and findings to be arbitrary and capricious.[20] It should also be noted that what is being reviewed here is not the findings of an agency but rather the decision of private trustees based on evidence collected by a hearing officer employed by a private trust. A reviewing court should keep in mind that those close to the trust indeed have a *duty* to preserve the corpus of that trust and, accordingly, are naturally disinclined to make awards from it. It is also to be surmised that these individuals have no tenure, less job security, and are generally less well-insulated from outside pressures than those government employees whose decisions are more commonly reviewed under the "arbitrary and capricious" or "substantial evidence" standards.

14. *Robinson v. United Mine Workers of Am. Health & Retirement Funds*, 640 F.2d 416, 420–21 (D.C.Cir.), *cert. granted,* —— U.S. ——, 102 S.Ct. 89, 70 L.Ed.2d 82 (1981). *See also Pete v. United Mine Workers of Am. Welfare & Retirement Fund of 1950*, 517 F.2d 1275, 1283 (D.C. Cir.1975) (en banc); *Roark v. Boyle*, 439 F.2d 497, 499 (D.C.Cir.1970); *Gomez v. Lewis*, 414 F.2d 1312, 1313–14 (3d Cir. 1969); *Gaydosh v. Lewis*, 410 F.2d 262, 265 (D.C.Cir.1969); *Roark v. Lewis*, 401 F.2d 425, 426–27 (D.C.Cir.1968); *Kosty v. Lewis*, 319 F.2d 744, 747 (D.C.Cir. 1963), *cert. denied*, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); *Danti v. Lewis*, 312 F.2d 345, 348 (D.C.Cir.1962).

15. *Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (quoting *American Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)).

16. *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970) (footnote omitted), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

17. *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1049 n.23 (D.C.Cir.1979) (citation omitted).

18. *Id.* (citations omitted).

19. *Id.* at 1050.

20. *Robinson v. United Mine Workers of Am. Health & Retirement Funds*, 640 F.2d 416 (D.C. Cir.), *cert. granted,* —— U.S. ——, 102 S.Ct. 89, 70 L.Ed.2d 82 (1981); *Lavella v. Boyle*, 444 F.2d 910 (D.C.Cir.1971), *cert. denied*, 404 U.S. 850, 92 S.Ct. 84, 30 L.Ed.2d 89 (1971); *Roark v. Boyle*, 439 F.2d 497 (D.C.Cir.1970); *Roark v. Lewis*, 401 F.2d 425 (D.C.Cir.1968); *Kosty v. Lewis*, 319 F.2d 744 (D.C.Cir.1963), *cert. denied*, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); *Danti v. Lewis*, 312 F.2d 345 (D.C.Cir. 1962); *Blankenship v. United Mine Workers of Am. Welfare & Retirement Fund*, Nos. 2186–69 & 2350–69 (settlement approved by D.D.C. 2 Jan. 1973); *Maggard v. Huge*, No. 76–2219 (settlement approved by D.D.C. 14 Mar. 1979).

None of this is intended to disparage the performance of the trustees and their hearing officers. As we just stated, they might be remiss in their duties were they to be too generous with the funds entrusted to them. However, judicial review of their denial must be undertaken with similarly stern hand and flinty eye. Preservation of the corpus of the trust is the duty of the trustees, but not at the expense of the intended beneficiaries.

## B. *The Instant Litigation*

As we discussed above,[21] appellant in this action claims that her husband met the requirements of *Blankenship* Test Two: that he (1) completed 20 years of classified service prior to 1953, (2) had at least some signatory service after 28 May 1946, and (3) was physically unable to satisfy the "20-out-of-30" requirement because of a permanent mine-related disability. Appellees have not challenged—in their brief or at oral argument—that Maggard met the latter two requirements, and counsel for appellant conceded at oral argument that, with respect to the first requirement, nothing in the post-1937 period was disputed. *Thus, the crux of this case is how many years' credit is due Maggard for the 1921–37 period, for the entirety of which he claims employment.*

Mrs. Maggard needs to show that her husband had 20 years' total credit of lifetime service under *Blankenship* Test Two. He was awarded 7¼ years in the post-1937 period, which means she needs credit for an additional 12¾ years for the 1921–37 period. If *Maggard v. Huge* applies,[22] then she would need 4 years' less credit than that, or 8¾ years. The trustees have already given Maggard credit for 5½ years in this period,

so what the dispute finally reduces to is whether appellant is entitled to an additional 7¼ years—or 3¼ years if *Huge* applies—from 1921 to 1937. Specifically, the years appellant has claimed, but appellees have denied, are 1921–24, 1928–29, and 1930–34.

In reviewing the appellees' decision to withhold benefits and granting their motion for summary judgment, the district court concluded that "the hearing officer deemed much of [appellant's] testimonial evidence incredible" and, since the court was "not empowered to conduct a review *de novo*," it "must adopt the hearing officer's evaluation of the testimony ...."[23] The court concluded that "it was neither arbitrary nor capricious to deny Plaintiff Pension benefits."[24]

We believe that the district court made a generally accurate statement of the standard for judicial review here,[25] but the record before us causes us to doubt that the district court met even this relatively permissive standard. And, as we discussed earlier,[26] the circumstances surrounding the case are such that a court must be careful to meet that standard.

Our reasons for doubting that review was adequate fall into two basic categories. First, the issues were not joined by either side until appellate oral argument, so it seems unlikely that the district court would have reviewed those issues adequately. Second, our understanding of the issues makes it appear that, indeed, substantial evidence does *not* support appellees' position. While we leave open the possibility that the district court may ultimately conclude the contrary, our impression underlines the appropriateness of a remand for

---

**21.** P. 570 *supra.*

**22.** *See* pp. 570–571 *supra.* Because the findings of the district court may make unnecessary, one way or the other, the resolution of *Maggard v. Huge's* applicability, we do not reach this issue today. We note, however, that the *Maggard v. Huge* settlement eliminates as a basis for denying disability credit the fact that Maggard failed to obtain a workers' compensation award. The issue, should it become neces-

sary to reach it, appears susceptible to resolution with expedition.

**23.** *Maggard v. O'Connell*, No. 80–2711, order at 1 (D.D.C. 7 Apr. 1981).

**24.** *Id.* at 2.

**25.** *Cf.* pp. 570–572 *supra* ("2. *Standard for judicial review*").

**26.** Pp. 571–572 *supra.*

fuller, more explicit consideration and analysis by the district court. "[W]e must be satisfied that the [tribunal—here, the trustees] has given reasoned consideration to all the material facts and issues; that its findings of fact are supported by substantial evidence ...." [27] And, "[i]n general, *the [tribunal] must engage in reasoned decision-making, articulating with some clarity the reasons for its decisions and the significance of facts particularly relied on.*" [28]

With respect to the confusion of the issues and their presentation below, we think that the district court should insist that the parties present their contentions on a year-by-year basis in graphic and intelligible form. Of great assistance would be a chart identifying each disputed year and the information relevant to it: whether it was admitted or denied by the trustees as a year of service and the contentions of each party on that issue, with page references to the record and the names of witnesses and documents relied upon.

As for the second point—that it is doubtful at this point that substantial evidence is consistently present in support of appellees' position—a few examples should suffice for the guidance of the district court. It may conclude that substantial evidence *does* exist, either elsewhere in the present record or in the additional evidence it may call upon or allow the parties to present. But because this case is, as we discussed before, one calling for unusually painstaking review, the court should make a careful and explicit analysis of the evidence before reaching whatever conclusion it does.

We turn now to some examples indicating that the trustees' position is not supported by substantial evidence.

*1921.* The hearing officer denied appellant's claim that her husband had been employed with the Dorton Elkhorn Coal Company in 1921 "because no evidence has been introduced to substantiate the claim." [29] Yet Maggard's wife and sister gave testimony that he had been so employed, and the Pike County School Board of Education records indicate that Maggard was not enrolled in school that year. Appellees attack Mrs. Maggard's testimony by pointing out that she did not meet Mr. Maggard until 1929; they attack his sister's testimony as reflecting that of his other sister and as inconsistent with her own recollection; they offer testimony of an employee of the Clerk's Office of the County Court that Maggard *was* in school in 1921; and finally they conclude, "In any event, the evidence relied upon by Mrs. Maggard does not overcome the fact that Kentucky records show that Dorton [mine] did not operate in 1921 ...." [30] This last point is invalid since from the record all that is clear is that data for 1921 are not available. Appellees' challenge to the testimony of Maggard's wife and sister is similarly unconvincing since there is no mention of a hearsay objection in a proceeding such as this one.[31] Even if the second-hand nature of this testing was shown to affect its credibility, it would not be affirmative evidence that Maggard did *not* work during these years, and so the remaining evidence would be unaffected. Finally, the testimony of the county employee is undocumented and, even if true, would not preclude the possibility of Maggard's having worked a night or evening shift and gone to school in 1921.

*1928–29.* The trustees denied Maggard credit for January 1928 to April 1929 on the grounds that "the evidence submitted has

**27.** *Central Fla. Enters., Inc. v. FCC,* 598 F.2d 37, 49 (D.C.Cir.1978) (footnotes omitted) (citing *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), and *Fidelity Television, Inc. v. FCC,* 515 F.2d 684, 699 (D.C.Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975)), *cert. dismissed,* 441 U.S. 957, 99 S.Ct. 2189, 60 L.Ed.2d 1062 (1979).

**28.** 598 F.2d at 49 (emphasis added).

**29.** J.A.E., vol. I at 81.

**30.** Brief for Appellees at 33 (citation omitted).

**31.** *Cf.* 5 U.S.C. § 556(d) (1976) (no hearsay prohibition in administrative proceedings). Note too that the trustees often relied on second-hand testimony. *See* J.A.E., vol. I at 76–77.

failed to establish the claimed period of employment and the type work performed." [32] Yet appellant had offered the testimony of herself, Maggard's sister, Hillard Bartley, Milton Blanton, and S. V. Williams that Maggard had worked in the coal industry at that time. Appellees argue that there is substantial evidence refuting this testimony, pointing to other passages in the testimony of Messrs. Bartley, Blanton, and Williams, and arguing that state mining records show that the Edgewater mine, also known as Coaldale or Edgewater-Coaldale, did not operate in 1928.

But the state mining records do not indicate that Edgewater-Coaldale was closed in 1928, only that "no book" was kept for that year. There is no indication in the record what, if anything, is to be concluded from that. Even the testimony of those on whom appellees rely indicates that the plant was open that year; at any rate, even if the plant was closed in 1928, this would not explain why credit was not awarded for 1929. As for the "contradictory" testimony of Messrs. Bartley, Blanton, and Williams, there clearly does not seem to be here evidence substantial enough to override the other testimony of these and the additional witnesses relied on by appellant. Bartley stated, "I didn't work with him, but we worked the same mine [from] ... [b]ack in the twenties, up til 1933." [33] The "refutation" is from the summary by the hearing officer: "In regard to Coaldale, Mr. Bartley stated that he went to work at Coaldale and worked there until it shut down March 29, 1929, but had no recollection of appellant working there," and "Mr. Bartley further stated that he never knew of appellant at Coaldale ...." [34] At most, this might discount Bartley's statement that he and Maggard had worked "in the same mine ... up til 1933," but it is hard to see how Bartley's nonrecollection could reasonably be taken as proof that Maggard did not work at Coaldale, refuting the affirmative testimony of other witnesses.

Appellees state that "Blanton testified that he worked at Edgewater-Coaldale until it shut down in 1929, and that Maggard had not worked there ...." [35] But the complete hearing transcript indicates that this is a gross oversimplification:

EXAMINER: OK. Did [Maggard] work there [at Edgewater-Coaldale] with you?

MR. BL.: No, not that I remember. See there were an awful lot of men working in the mines at that time. They were crowded. One ... [non-transcribable] ... would have as high as 60 coal loaders and you couldn't keep counting them, some would go to work before others did, you know. Be such a crowd, why you wouldn't pay any attention.

....

EXAMINER: OK. Did you work with [Maggard] any more after [1927]? Did you have any knowledge of where [Maggard] worked after that time?

MR. BL.: No ... I don't remember.

....

MR. FRANTZ: Now, you said after 1927 you never worked with [Maggard], but *do you know whether he was working in the coal mines?*

MR. BL.: *I'd see him with his bank cloths on. Back then you know they had them [non-transcribable] ... I'd see him pass by where I lived in camp, you know. He'd pass by you know, whether he was working Henry Clay, or I mean Greenough, or Edgewater [mines], or what, I don't know that. We were on different shifts you know.*

MR. FRANTZ: *But he was working ...*

MR. BL.: *He was a working in some mines because he'd come by with his, a whole gang of miners, you know, would come by. And, have their dinner buckets and his work clothes on, his face was black....*

MR. FRANTZ: And you would see him regularly...

**32.** J.A.E., vol. I at 82.

**33.** *Id.* at 36.

**34.** *Id.* at 76–77.

**35.** Brief for Appellees at 35 (citation omitted).

*MR. BL.*: I'd see him regularly, but I don't remember where, which one of these places he was working. You know back then, a good worker, if he could, something happened to him here, he didn't like it here, why he'd quit and start to work another place, upon a day, you know. You didn't have to have no doctor's examination ... just go up, put your name on a card and go on to work.

*MR. FRANTZ*: And, did you ever know [Maggard] to do any other kind of work or was he always a miner?

*MR. BL.*: He was always a miner, as far as I know, cause after so many years, he separated, and he raised a family and he got away from there. And I used to get in contact with him now and then.[36]

Taking this testimony as a whole, it would be difficult to conclude anything except that Blanton definitely recalled Maggard working during these years, but that he was not sure where. Appellees conceded at oral argument that the particular mine in which Maggard was working is irrelevant for the purposes of determining pension eligibility. Thus, Blanton's testimony is no help in justifying the trustees' denial. To the contrary, it seems strong support that credit for the years 1928 and 1929 should have been granted.

Finally, with respect to Williams, appellees again cite the hearing officer's summary:

Mr. Williams had signed a statement from 1928 to 1929 at Edgewater Coal Company, but there was not a file in Central Office.

A telephone call to Mr. Williams revealed that he had worked at Big Ranch [mine] from approximately 1925 until 1933 when he left for Weeksbury, Kentucky. He stated that he had worked at Big Ranch, Coaldale and Henry Clay during his tenure at Edgewater Coal Company but he only recollected appellant as being at Big Branch as a coal dumper and weighman.

He implicitly stated that he had no recollection of appellant at Henry Clay or Coaldale.[37]

It should be noted first that Williams specifically verified *twice* in writing that Maggard worked at Edgewater in 1928 and 1929.[38] And, while the quoted summary seems inconsistent with that affirmative recollection, it can in no way be read as an affirmative recollection on its own that Maggard was not at Coaldale, or was not employed in the coal industry elsewhere. The statement that "he only recollected appellant as being at Big Branch as a coal dumper and weighman" would seem to be irrelevant to appellant's claim that Maggard was working at Edgewater in 1928 and 1929. By its own terms the summary indicates that Williams was at Big Branch in 1928 and 1929, so we would not expect him to recall Maggard being at Coaldale during this time. Thus, even if this rather ambiguous summary of Williams' recollection is substantial enough evidence to override Williams' two written statements, which we doubt, it could hardly override the testimony of the three or four other witnesses appellant has supplied.

*1930–31.* Appellant claims that her husband should also be granted credit for 1930 to 1931. She offered documentary evidence which included a 1930 marriage license and 1931 birth certificate listing Maggard's occupation as mining, and an employment application for Koppers Coal Company. (All of these are recognized by the trustees as sources of proof.[39]) Oral testimony was also offered, from appellant herself, Hillard Bartley, and Milton Blanton. Appellees attack the oral testimony for these years for the same, generally unconvincing reasons they attacked it for the years 1928–29. The documentary evidence is attacked as demonstrating that Maggard's occupation was mining, but not that he was currently working. But while this is perhaps plausible with respect to the marriage license and birth certificate, the job application appears

36. J.A.E., vol. I at 40–45 (emphasis added).

37. *Id.* at 79.

38. *Id.* at 95; *id.*, vol. II at 97.

39. *Id.*, vol. I at 84.

less vulnerable to the attack. Moreover, it merits explanation why in the context of an inquiry like this one such documentary evidence would be invited were it to be used for the determination of occupation only. Appellee also entered the oral testimony of two other witnesses,[40] but it is at least unclear why this testimony is inconsistent with appellant's claim, let alone why it was held to override other testimony to the contrary.

*1921–24, 1932–34.* Appellant also claims and has put forward evidence of employment with the Edgewater Coal Company for the years 1921–24 and, with Edgewater or Greenough Coal Company, for 1932–34. Again, much of the "contradictory" evidence by appellees is not contradictory at all. Other evidence indicates only disagreement as to which mine was worked in (and this, without more, is irrelevant since all that is at issue is employment somewhere, anywhere, in the coal industry). What evidence remains often merely discredits the testimony of one witness without undermining that of other witnesses or in any way affirmatively demonstrating that Maggard was not employed *somewhere* in the coal industry. There also exists documentary evidence of employment in these years.

One general observation is in order here. The hearing officer and trustees apparently held that, where an individual testified that Maggard worked in the coal industry at a certain mine in a given year, if the memory of the mine's name was called into doubt, the balance of the testimony was to be rejected also. This decision merits at least an explanation, given the fact that neither party here contends that the mine's name is in any way relevant so long as Maggard was employed somewhere in the coal industry during that time. Granted, in certain instances it might reasonably be concluded that if the mine's name was not recalled correctly, the other testimony of that witness, or the testimony of another witness, was suspect. But this is not always so. For instance, the testimony of Blanton

would seem to present an instance where, regardless of whether the mine's name was known, there was unequivocal testimony that Maggard was working in some mine, somewhere, at the appropriate time.[41] We should be particularly reluctant to require errorless specificity and documentation with respect to events occurring from forty-five to sixty years ago in an era and location rather less compulsive in its record-keeping than 1982 Washington, D.C.

### III. CONCLUSION

After examining the present record the district court may conclude that a summary judgment—for one party or the other—is appropriate, but it may well be that on some critical point additional testimony needs to be invited. If this is the case, the district court should not hesitate to call for it. Whatever the court's ultimate decision, it should demand that the parties be explicit and coherent in their presentation of the issues, and should itself be no less explicit in its findings. This case is relatively unusual insofar as it dictates that a "substantial evidence" standard of judicial review be applied in a skeptical and wary manner; the district court's too hasty acceptance of the trustees' findings was therefore understandable. Nonetheless, on remand we think it necessary to scrutinize more carefully and expressly those findings.

*So ordered.*

**40.** *Id.*, vol. II at 11–12.

**41.** *See* pp. 574–575 *supra*.